337 A.2d 573
COMMONWEALTH of Pennsylvania
v.
Ronald H. ROBSON, Appellant.

Supreme Court of Pennsylvania.
Argued Dec. 3, 1974.
Decided May 13, 1975.

**616**

James S. Kilpatrick, Jr., Ardmore, for appellant.

Milton O. Moss, Dist. Atty., William T. Nicholas, First Asst. Dist. Atty., Stewart J. Greenleaf, Asst. Dist. Atty., Chief, Appellate Div., Norristown, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant was convicted in a jury trial of voluntary manslaughter and sentenced to pay the costs of prosecution and to serve a term of five to ten years imprisonment. In this direct appeal,[1] he contends that (1) he

---

1. Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, § 202(1), 17 P.S. § 211.202(1) (Supp.1974).

was placed twice in jeopardy by being retried after the declaration of a mistrial, (2) the evidence was insufficient to sustain a conviction of voluntary manslaughter, and (3) he was prejudiced by various trial errors. We affirm.

## I.

The facts on which appellant's double jeopardy claim is based are these. On May 16, 1973, appellant's first trial on the charge of which he was convicted began. On May 23, before the completion of the Commonwealth's case and during a recess, the trial judge became ill and the trial was continued by the president judge until May 29 in order to ascertain whether the original judge would be able to promptly resume the trial. When informed of the need for this delay, appellant's counsel orally moved for a mistrial to avoid the danger of prejudicing the jury. Action on this motion was deferred until May 29.

At the hearing on May 29, appellant's counsel sought to withdraw the oral motion for a mistrial. The president judge, however, stated that he had granted the motion for a mistrial before reading the motion to withdraw it. He also observed that it would be several weeks before the original judge could resume his duties [2] and concluded that it would be unfair to both parties and to the jury to continue the proceedings any further. The motion to withdraw the motion for a mistrial was formally denied and a mistrial declared. Subsequently appellant was retried and convicted of voluntary manslaughter. The claim that the second trial subjected appellant to double jeopardy has been asserted at all appropriate stages of the proceedings.

2. At the time the mistrial was declared, the medical prognosis was that the judge would be unable to resume his duties for at least two weeks and probably longer. In fact it was eight weeks before he did return to the bench and then he engaged in service less arduous than conduct of criminal jury trials for some further period.

The Commonwealth asserts that any double jeopardy problem is obviated by the fact that the mistrial was granted in response to a motion by appellant. See *Commonwealth v. Schaffer*, 447 Pa. 91, 101, 288 A.2d 727, 733 (1972); *Commonwealth v. Wright*, 439 Pa. 198, 201, 266 A.2d 651, 653 (1970). In the circumstances of this case, however, we do not believe that it can realistically be said that the mistrial was granted at the request of appellant. The one sentence motion to withdraw the request for a mistrial was before the court when the May 29 hearing commenced. No reason was advanced for denying that motion and we attach no significance to the fact that the court acted without reading the motion first.

Our conclusion on this point is bolstered by *United States ex rel. Russo v. Superior Court*, 483 F.2d 7 (3rd Cir.), cert. denied, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed. 2d 315 (1973). In that case, the defendant moved for a mistrial at the end of the first day of jury deliberations on the ground that the jury was deadlocked. This motion was denied, but a mistrial was declared after the jury had deliberated for several hours the next day, the trial court expressing the view that the jury was exhausted and that forcing it to continue deliberations risked an unjust verdict. No new motion for a mistrial was before the court, but it asserted that it was "in effect" agreeing to the motion made the previous day. The Third Circuit held that a second trial would violate the double jeopardy clause. In disposing of the contention that retrial was proper because defendant had moved for a mistrial, that court wrote:

> "Appellant's assessment of his chances with the jury could easily have changed after his request for a mistrial. We see no reason to lock him into a motion once it is made."

Id. at 17.

While the instant case differs from *Russo* in that the motion there had been denied, we think that appellant adequately informed the court of his change of position. Consequently, we conclude that the mistrial was not declared at the request of appellant.

■ Appellant then argues that it was improper for the court to declare a mistrial sua sponte, relying on *Commonwealth v. Lauria,* 450 Pa. 72, 297 A.2d 906 (1972). However, in *Lauria,* no opinion commanded a majority of the Court. Moreover, it has been superseded by *Commonwealth v. Stewart,* 456 Pa. 457, 317 A.2d 616 (1974). While there was some disagreement in *Stewart* regarding the effect of Pa.R.Crim.P. 1118(b), 19 P.S. Appendix [3] upon the power of a trial court to declare a mistrial because of events prejudicial to the defendant, the result in this case is the same under any of the views expressed in *Stewart.* The mistrial here resulted, not from an event prejudicial to the defendant, but from the practical inability of the original tribunal to complete the trial. A rule requiring a motion by the defendant for declaration of a mistrial in this type of case would entail total abandonment of the prosecution rather than merely its completion before an arguably imperfect tribunal. As the trial court in this case observed, "If a judge dies, and if the defendant has to be the one to make the motion for a mistrial, he would never come to trial."

■ It is well settled that a defendant may be retried after an earlier proceeding has terminated in a mistrial if there was "manifest necessity" for the mistrial. *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed. 2d 425 (1973); *Gori v. United States,* 367 U.S. 364, 81

3. Rule 1118(b) provided:
"A motion to declare a mistrial shall be made when the prejudicial event is disclosed. In all cases only the defendant or the attorney for the defendant may move for a mistrial." (The rule was substantially amended on June 28, 1974, effective September 1, 1974.)

S.Ct. 1523, 6 L.Ed.2d 901 (1961); *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). No rigid rule for determining what constitutes "manifest necessity" for a mistrial has been established. Rather the Supreme Court has adhered to the principle expressed by Justice Story, writing for the Court in *Perez*, supra, at 580, 6 L.Ed. 165:

> "We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office."

While this standard fails to provide specific guidance for determining what constitutes "manifest necessity" for a mistrial, the outlines of that concept become apparent from consideration of the facts in those cases where the question has been decided. We think it clear that illness of the judge preventing continuation of the trial for a period of several weeks at the least constitutes "manifest necessity" for the declaration of a mistrial. See *Illinois v. Somerville*, supra (discovery of a defect in the indictment depriving the trial court of jur-

isdiction constitutes "manifest necessity"); *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949) (tactical requirements of army in the field constitute "manifest necessity" for discharge of court martial); *Logan v. United States*, 144 U.S. 263, 12 S.Ct. 617, 36 L. Ed. 429 (1892) (inability of jury to agree after 40 hours of deliberation constitutes "manifest necessity"); *United States ex rel. Gibson v. Ziegle*, 479 F.2d 773 (3rd Cir. 1973) (heart attack which prevents key prosecution witness from completing testimony constitutes "manifest necessity"); *Commonwealth v. Davis*, 266 Pa. 245, 110 A. 85 (1920) (discovery that juror is suffering from influenza which might infect other jurors and epilepsy which caused momentary lapses from consciousness without visible evidence of that condition constitutes "manifest necessity").

Because the illness of the judge rendered completion of the trial by the original tribunal effectively impossible, there was no method by which appellant's "valued right to have his trial completed by a particular tribunal," *United States v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion) (Harlan, J.), could be reconciled with the public interest in obtaining the adjudication of guilt or innocence. It is this factor which distinguishes the present case from those where insufficient weight was assigned to the former consideration when the mistrial was declared. E. g., *Jorn*, supra; *Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); *United States v. Kin Ping Cheung*, 485 F.2d 689 (5th Cir. 1973); *United States ex rel. Russo v. Superior Court*, 483 F.2d 7 (3rd Cir. 1973); *Commonwealth v. Schaffer*, 447 Pa. 91, 288 A.2d 727 (1972); *Commonwealth v. Culpepper*, 221 Pa. Super. 472, 293 A.2d 122 (1972).

Appellant places primary reliance on three cases: *Commonwealth v. Wideman*, 453 Pa. 119, 306 A.2d 894 (1973); *Commonwealth v. Ferguson*, 446 Pa. 24, 285 A.

2d 189 (1971); *Commonwealth v. Brooks,* 225 Pa.Super. 247, 310 A.2d 338 (1973). However, none of these cases are in point.

In *Wideman,* a mistrial had been declared by a visiting judge when he discovered that the trial would extend beyond the period he had been assigned to preside in that court. There we held that "a trial judge's convenience does not constitute 'manifest necessity'" for a mistrial. 453 Pa. at 122, 306 A.2d at 895. Here, the mistrial resulted from the inability of the judge to preside because of serious illness, not mere personal "convenience."

In *Ferguson,* the mistrial was declared because one of the prosecution's witnesses had become ill. There the defense suggested that the trial proceed on those charges as to which the ill witness was not necessary or that there be a brief continuance to obtain a medical diagnosis of the witness's illness and an estimate of its probable duration. These suggestions were rejected and a mistrial declared. We held that in the absence of more definite information on the nature of the illness or any effort to protect the defendant's "valued right to have his trial completed by a particular tribunal" there was no "manifest necessity" for declaration of a mistrial. Here, in contrast, there was a medical prognosis that the original judge would be unable to resume his duties for several weeks at least. No proceedings could be conducted in his absence unless a mistrial were declared.

In *Brooks,* there had been two mistrials before the trial in which the defendant was convicted. One of these was declared because of illness of the prosecuting attorney and the other because the jury had been unable to agree after nine hours of deliberation. The Superior Court held that each of the mistrials had been improper. Appellant seeks to analogize the illness of the prosecuting attorney in *Brooks* to the facts of this case. However, the opinion of the Superior Court does not indicate the nature of that illness, if indeed this was determined

by the trial court. The Superior Court's reliance on *Ferguson* suggests that the factual pattern may have been similar. Moreover, it may have been possible for another prosecuting attorney to assume control of the Commonwealth's case and complete the trial, whereas it would not have been possible for another judge to have completed the trial in progress at the time of the mistrial. (The Superior Court's failure to elaborate on the precise factual pattern surrounding the first mistrial doubtless resulted from the obvious error in declaring the second mistrial after a relatively brief period of jury deliberation.)

We find appellant's claim that he was placed twice in jeopardy for voluntary manslaughter without merit.

## II.

Appellant next contends that the evidence was insufficient to support his conviction of voluntary manslaughter. We cannot agree.

Voluntary manslaughter is the intentional, though non-malicious, killing of another person without justification or excuse. Commonwealth v. Campbell, 451 Pa. 465, 468, 304 A.2d 121, 122 (1973); *Commonwealth v. Edwards,* 448 Pa. 79, 83, 292 A.2d 361, 363 (1972); *Commonwealth v. Conner,* 445 Pa. 36, 38 n. 2, 282 A.2d 23, 24 n. 2 (1971). The test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have found that all of the elements of the crime had been established beyond a reasonable doubt. *Commonwealth v. Boyd,* 461 Pa. 17, 22, 334 A. 2d 610, 613 (1975); *Commonwealth v. Murray,* 460 Pa. 605, 609, 334 A.2d 255, 257 (1975).

The decedent, Francis Carney, died of five stab wounds. Appellant admits that he inflicted these wounds but contends that he did so in self-defense.

The only direct evidence of the circumstances of the killing was appellant's statement to the police, which he reaffirmed and elaborated upon at trial. According to appellant's statement he had been hitchhiking home after an evening of drinking in the early morning hours of December 9, 1972, when he was picked up by an unidentified male, who offered to have a friend drive appellant home. They proceeded to a nearby bar where appellant was introduced to the decedent, who agreed to drive him home. After they had entered the decedent's vehicle, decedent said that it would be necessary for him to stop at his house to obtain money for gas before taking appellant home. When they arrived at the decedent's house, he invited appellant in for a drink while he got the money. Appellant accepted.

After pouring appellant a drink and chatting briefly, the decedent went upstairs and, after a few minutes, called to appellant to join him. Appellant went to the second floor and found it darkened, except for a light in the bathroom. He moved toward the bedroom and, as he entered the doorway, decedent grabbed him in the groin. Appellant struck the decedent and ran downstairs, hoping to find an exit. He found none, for all of decedent's doors were equipped with burglar locks," requiring a key to open from either side.

Decedent then appeared at the top of the steps, nude and waving a pistol. (This was in fact a starter's pistol, capable only of firing blanks, but appellant claims not to have known this.) A room-to-room chase through the house then ensued. Decedent fired two (blank) shots and appellant grabbed two kitchen knives to defend himself. Appellant, at various points in the encounter, inflicted several wounds on decedent, including the five fatal stabbings—three in the chest and two in the back. Appellant then escaped through a window, taking with him the gun, the knives, the glass from which he had drunk, and the keys to decedent's car.

It is appellant's contention that the homicide was justified or excusable because he was acting in defense of his life, see *Commonwealth v. Daniels,* 451 Pa. 163, 301 A.2d 841 (1973), and to prevent the forcible perpetration of a felony, sodomy, upon his person. See *Commonwealth v. Harris,* 444 Pa. 515, 281 A.2d 879 (1971) ; *Commonwealth v. Emmons,* 157 Pa. 495, 43 A.2d 568 (1945).

However, as we recently said in *Commonwealth v. Murray,* 460 Pa. 605, 609, 334 A.2d 255, 257 (1975) :

"It is the province of the trier of facts to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. *Commonwealth v. Smith,* 457 Pa. 638, 641, 326 A.2d 60, 61 (1974); *Commonwealth v. Pacquette,* 451 Pa. 250, 257, 301 A.2d 837, 841 (1973) ; *Commonwealth v. Garvin,* 448 Pa. 258, 269, 293 A.2d 33, 39 (1972).

The fact-finder is free to believe all, part, or none of the evidence. *Commonwealth v. Smith,* supra; *Commonwealth v. Roots,* 452 Pa. 535, 541, 306 A.2d 873, 877 (1973) ; *Commonwealth v. Williams,* 450 Pa. 158, 162, 299 A.2d 643, 645 (1973); *Commonwealth v. Oates,* 448 Pa. 486, 490, 295 A.2d 337, 339 (1972)."

On the basis of these principles, a claim substantially identical to that presented by appellant was rejected in *Commonwealth v. Harris,* 444 Pa. 515, 519, 281 A.2d 879, 881–82 (1971).

This standard of appellate review is especially pertinent in a case such as this where other evidence tends strongly to contradict portions of appellant's account of events. Frederick Quay, the individual who introduced appellant to the decedent, testified that after he picked appellant up they performed mutual fellatio upon one another and that the agreed purpose of introducing the deceased, who was known to Quay as a homosexual,

to appellant was to provide appellant with a place to stay for the night rather than a ride home. Moreover, public hairs which were clearly not those of decedent and similar in all respects to those of appellant were found on the bed and on a towel in the bedroom. Further, the presence of parasitic eggs on both the hairs found in the bedroom and the hairs taken from appellant renders it quite unlikely that the hairs found in the bedroom came from another person. These facts support an inference that appellant actually did have homosexual relations with the deceased, contrary to his account. Furthermore, foreign coins were scattered on the floor of the bedroom near an open bureau drawer, suggesting that someone had rummaged through the drawers. Finally, appellant's actions subsequent to the killing in attempting to destroy or dispose of evidence could have been interpreted by the jury as evidencing consciousness of guilt.

The jury was not obligated to believe appellant's exculpatory account of the circumstances surrounding his admitted killing of Carney. The evidence was clearly sufficient to support the conviction of voluntary manslaughter.

## III.

Finally, appellant alleges three errors in evidentiary matters. These concern (1) failure to suppress pubic hair samples which appellant claims were unconstitutionally seized, (2) the admission of expert testimony regarding those pubic hair samples, and (3) failure to declare a mistrial when a Commonwealth witness mentioned certain other indictments to which appellant had pleaded guilty but as to which no judgments of sentence had been imposed. We find no merit in any of these contentions.

The pubic hair samples were taken by a pathologist pursuant to a warrant issued after appellant had been taken

into custody. Appellant contends that there was no probable cause for the seizure of the samples. The magistrate was informed of the following facts: The decedent's nude body had been found in a pool of blood in the kitchen of his house and various quantities of blood were found in the other rooms of the house. The bed in the second floor bedroom had apparently been used and the condition of the house indicated a protracted struggle between the decedent and another person. The doors remained locked. Appellant had been arrested, pursuant to a warrant, for the homicide.[4]

On the basis of these facts, authority was sought to take samples of appellant's blood and his pubic, body, and head hair. Appellant contends that there was no basis for believing that a sample of his pubic hair would have evidentiary value. However, the fact that the doors were all locked strongly suggested that the assailant had been freely admitted by the decedent. This, coupled with the nudity of the body and the apparently used condition of the bed gave probable cause to believe that sexual activity had occurred. From the fact that appellant had been arrested for the homicide pursuant to a warrant, the magistrate could properly assume that there was probable cause to believe him the assailant.[5] Consequently, there was probable cause to believe that a sample of appellant's pubic hair would provide evidence concerning the crime. The seizure was thus entirely proper.

---

**4.** The Commonwealth represents in its brief that the magistrate was also told of Quay's statements that the decedent was known to Quay as a homosexual and that appellant and Quay had performed mutual fellatio upon one another shortly before Quay introduced appellant to the decedent. While there was a passing reference to this at the suppression hearing, the Commonwealth's evidence at trial showed that these statements were not made until two days after issuance of the search warrant. We therefore do not consider them in evaluating probable cause.

**5.** At no point in this case has appellant challenged the validity of this arrest.

630

■ Appellant also objects to the expert testimony regarding the identification of the hair samples. He argues that it was improper to admit expert opinion as to the origin of particular hair samples rather than having the expert testify only as to the method of comparison and the characteristics of the samples, leaving the jury to draw its own conclusions. However, the only objections presented at trial dealt with (1) the allegedly inadequate state of the art to form a basis for expert testimony and (2) the alleged impropriety of allowing the witness to testify that it was quite unlikely that the pubic hairs came from someone other than appellant rather than simply that the hairs could have come from appellant. Never did appellant suggest, as he does now, that expert testimony was improper because the jury was capable of forming its own opinion without expert testimony. Consequently, this contention is unavailable on appeal. *Commonwealth v. Johnson*, 457 Pa. 554, 559 n. 5, 327 A.2d 632, 635 n. 5 (1974); *Commonwealth v. Agie*, 449 Pa. 187, 189, 296 A.2d 741 (1972).

■ Appellant's last assignment of error is the trial court's failure to declare a mistrial after one of the Commonwealth's witnesses referred to an indictment against appellant as to which he had pleaded guilty but had not yet been sentenced. Because appellant had testified, the Commonwealth wished to introduce evidence of appellant's plea of guilty to an indictment for burglary in another county to impeach his credibility. It therefore called the deputy clerk of courts of that county as a witness. After establishing his name and official position, the following colloquy occurred:

"Q. What records or documents were you asked to bring with you, sir?

"A. Indictments, number 586 et cetera, December, 1969, and the defendant is Ronald Robson.

.   .   .   .   .   .   .   .   .

"Q. What do the records indicate?"

An objection was then interposed and a sidebar conference was held.

Appellant urged that evidence of conviction of other crimes is admissible for the purpose of impeachment only when there is a *judgment* of conviction; a plea of guilty upon which no judgment has yet been entered does not suffice. See *Commonwealth v. Finkelstein,* 191 Pa.Super. 328, 156 A.2d 888 (1959); *Commonwealth v. Socci,* 177 Pa.Super. 426, 428–29, 110 A.2d 862, 863 (1955). The trial court sustained this objection but rejected appellant's motion for a mistrial based on the testimony already heard by the jury. Appellant urges that denial of the mistrial was error.

The Commonwealth urges two alternate theories for affirmance. First, it contends that evidence of a plea of guilty should be admissible even though no judgment of sentence has yet been entered upon the plea. Second, it argues that the error, if any, was cured by the vigorous corrective measures taken by the trial court. Because we agree with the latter position, we have no occasion to consider the former.

At the end of the sidebar conference, the witness was excused and the trial court instructed the jury as follows:

".  .  . the jury is directed to completely disregard anything the witness John Glenn has said to you. It has no probative value, it has nothing to do with the case, and if it enters your thinking about the case you will be doing an injustice to the defendant, and it seems to me all of us want to be fair and just to the defendant as well as to the Commonwealth and so you will completely disabuse your mind of any impression you may have gotten from the witness, John Glenn."

Moreover, in its charge to the jury the court instructed:

".  .  . that the defendant does not have a criminal record, any part of the testimony which indicated

or suggests to you, to your mind that he may have a criminal record is unlawful as well as erroneous testimony and must be carefully and completely disregarded by you when you go into the question of his credibility or guilt in this case."

In light of the minimal information conveyed to the jury and the immediate and emphatic curative instructions, we do not believe that it was error to refuse a mistrial. See *Commonwealth v. Senk*, 412 Pa. 184, 193–94, 194 A.2d 221 (1963), vacated on other grounds, 378 U.S. 562, 84 S.Ct. 1928, 12 L.Ed.2d 1039 (1964).

Judgment of sentence affirmed.

NIX, J., filed a concurring opinion.

NIX, Justice (concurring).

While I do not agree with the Majority that the illness of a trial judge where trial is with jury, is necessarily "manifest necessity", see, *Commonwealth v. Brooks*, 225 Pa.Super. 247, 310 A.2d 338 (1973), I do however, believe the result is correct in view of defense counsel's original oral motion for a mistrial.