350 A.2d 797

**COMMONWEALTH of Pennsylvania**

v.

**Norman BULLARD, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 24, 1975.

Decided Jan. 29, 1976.

---

Neil E. Jokelson, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Daniel P. McElhatton, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant Norman Bullard was convicted after a jury trial of murder in the first degree. After post-trial mo-

tions were denied, judgment of sentence of life imprisonment was imposed. Appellant contends that statements given to police after he was taken into custody should have been suppressed. We agree, reverse the judgment of sentence and grant a new trial.[1]

■■ In all cases of first degree murder this Court is required by statute to "determine whether the ingredients necessary to constitute murder in the first degree shall have been proved to exist." [2] In so doing we must consider the record in the light most favorable to the Commonwealth's case. *Commonwealth v. Robson*, 461 Pa. 615, 630, 337 A.2d 573, 579 (1975); *Commonwealth v. Boyd*, 461 Pa. 17, 21, 334 A.2d 610, 613 (1975); *Commonwealth v. Murray*, 460 Pa. 605, 610, 334 A.2d 255, 257 (1975). Reviewing the record in this light we are persuaded that the jury's finding of the necessary elements of the offense is supported by the evidence.

The Commonwealth introduced into evidence an eight page signed statement appellant gave to the police admitting his participation in the stabbing. The Commonwealth also introduced the testimony of an eyewitness, Tyrone Raymond, who was present at the altercation and who said that appellant stabbed the victim. At least two other witnesses who saw the stabbing gave testimony implicating appellant. In view of the entire record we are convinced that the jury's verdict was supported by sufficient evidence.

We must next consider appellant's claim that his statement should not have been admitted into evidence. The facts surrounding this claim are unusual and indicate an alarming disregard for appellant's constitutional rights.

Appellant learned that he was being sought in connection with the stabbing of a young man. He feared that

1. We hear this appeal under authority of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1975).

2. Act of February 15, 1870, P.L. 15, § 2, 19 P.S. § 1187 (1964).

he might be harmed when apprehended by police. He expressed this anxiety to James "Country" Robinson, a gang-control worker. Robinson telephoned the Honorable Paul A. Dandridge, a judge of the Philadelphia Municipal Court (now a judge of the Court of Common Pleas), and explained the situation to him.

Judge Dandridge checked with police and learned that a warrant had been issued for appellant's arrest. He advised appellant to come to his chambers and surrender himself to the police. The judge arranged for Deputy Chief Gilbert Branche of the Philadelphia District Attorney's detectives to come to his chambers and take appellant into custody. Judge Dandridge apparently believed this arrangement would alleviate any anxiety appellant entertained about being taken into custody.

At about 2:30 p. m., Detective Branche went to Judge Dandridge's chambers. Appellant was there with "Country" Robinson and a few others. In his suppression hearing testimony, Branche described what transpired:

"Judge Dandridge said to me that 'This is Norman Bullard, the fellow that we have talked about. He is wanted by the police department.'

"He said, 'Norman's family is out trying to obtain a lawyer at this time. I don't think they have reached one yet.'

"And I think Norman said, 'No, they haven't.'

"He said, 'Well, I want you to take Norman down to the police department, and I don't want anyone to talk to him until his family obtains a lawyer.'

"I said to the judge, 'I'll take him down there and I will relay your message, although they will talk to him anyhow, as their policy. They are going to ask him things about his personal life and also about this crime.' "

Detective Branche delivered appellant into the custody of the homicide unit at about 3 p. m. He relayed Judge Dandridge's directions, that appellant was not to be questioned, to Sergeant Green of the homicide unit.

Appellant was placed in an interrogation room, handcuffed to a metal chair which was bolted to the floor, and interrogated by homicide detectives. At 11:40 p. m. appellant signed an eight page statement admitting his participation in the stabbing. Although the record does not give the exact time,[3] appellant was arraigned sometime after 12:15 a. m.

■ Appellant contends that he did not waive his right to have counsel present while being questioned. He argues that, in view of his apprehensions and Judge Dandridge's instructions, it was improper for the police to conduct the uncounselled interrogation. Thus, the determinative question is whether appellant made "an intentional relinquishment or abandonment" of his right to counsel and his right to remain silent. See *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). A defendant may indeed waive these rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

■ It is well established that the Commonwealth has the burden of proving by a preponderance of the evidence that the defendant made a knowing, voluntary and intelligent waiver of his rights. See *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *Commonwealth v. Bishop*, 425 Pa. 175, 228 A.2d

---

3. In this case, as with many others which have been before this Court, the police log indicates with great detail even the least important event during the period following arrest. The final entry, however, the actual time of preliminary arraignment remains unspecified. Thus we rarely can determine the total length of delay between arrest and arraignment. See *Commonwealth v. Smith*, 463 Pa. 393, 397, 344 A.2d 889, 891 (1975) (dissenting opinion of Roberts, J., joined by Manderino, J.).

661 (1967); *Commonwealth v. Ewell,* 456 Pa. 589, 319 A.2d 153 (1974); *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968). Our review here is aimed at determining if the Commonwealth sustained that burden at the suppression hearing.

It is of no moment whether appellant's fears about being harmed by police were justified. What is of consequence, however, is that appellant was fearful and sought the assistance of others in connection with his surrender. Through the intervention of "Country" Robinson and Judge Dandridge, appellant received guidance concerning his course of action. The record shows that, through these intermediaries, appellant expressed a clear desire not to be questioned until counsel was obtained for him—as he was constitutionally entitled to do. *Miranda v. Arizona,* supra; *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Commonwealth v. Ware,* 446 Pa. 52, 284 A.2d 700 (1971). Judge Dandridge conveyed this invocation of appellant's rights to Detective Branche.

Though this claim of right was conveyed to the officer on duty at the homicide unit, the homicide personnel intentionally disregarded the claim. In his suppression hearing testimony, Sergeant Green, the officer on duty when appellant was taken into custody, details this disregard:

"Q. [Appellant's counsel] Then why, sir, did you, did the homicide unit, if you know, disregard what Judge Dandridge had stated to Gilbert Branche?

A. [Sergeant Green] He stated that he did not want the defendant to talk to the homicide detectives. We do talk to defendants when they come into homicide unit.

Q. Did you understand then that your action in talking to Norman Bullard was consistent with Judge

Dandridge's stating that he did not want the boy to talk to homicide?

A. No sir."

The Commonwealth contends that once appellant was taken to the homicide unit interrogation room "he indicated that he wanted to give a statement to the police." The only apparent basis for this contention that appellant changed his mind once he was alone with homicide detectives is the series of one word answers appellant gave to the pro forma questions in the *Miranda* warnings read to him. We find this insufficient to sustain the waiver asserted by the Commonwealth. Nor are we persuaded by the testimony of Detective White, an interrogating officer, that appellant indicated a willingness to talk by "answering the questions."

■ On the facts presented here, we do not find that the Commonwealth sustained its burden of proving a knowing, voluntary and intelligent waiver. The Commonwealth must show not merely that appellant acquiesced in the face of interrogation but also that they "scrupulously honored" appellant's assertion of his rights. See *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). As the United States Supreme Court explained in *Miranda v. Arizona:*

"A valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed. 2d 70 (1962), is applicable here:

'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' "

Supra, 384 U.S. at 475, 86 S.Ct. at 1628. We do not find that the mere answering of questions by a man who fears police, given while handcuffed to a metal chair in an interrogation room constitutes the "free choice" described in *Miranda,* supra at 465, 467, 86 S.Ct. at 1623, 1624.[4]

■■ Though it is possible that one who expresses a desire to exercise fifth or sixth amendment rights may later change his mind and waive the rights, such a conclusion cannot be justified where, as here, police disregard the initial exercise of the rights. Because we cannot find that the Commonwealth sustained its burden of proving waiver, we hold that the admission into evidence of the inculpatory statements was error.

Moreover, we cannot conclude that the error was harmless. Because a confession is the most damning of

4. The same issue was presented in a similar factual setting in *United States v. Slaughter,* 366 F.2d 833 (4th Cir. 1966) (en banc). There the accused expressed a desire to have counsel present. Questioning was then discontinued and the accused remained in custody. Investigating officers later resumed questioning and elicited incriminating statements from the accused. The reading of appellant's rights and his answering questions was held insufficient to support the government's contention that the defendant had waived the right to counsel he had earlier attempted to assert. We find the reasoning and holding of the Fourth Circuit equally applicable here:

" . . . appellant manifested his desire to exercise his right to counsel. . . . [H]e did not initiate additional conversation with agents of the F.B.I. . . . His interrogation was initiated solely by the F.B.I. . . . [T]here is nothing in this record to support an express change of mind on appellant's part of his desire to consult counsel, and a departure from his previously announced desire to exercise his right should not be lightly inferred. A statement that appellant had a right to remain silent, on the facts here, was insufficient to overcome the respect to which his expressed desire to consult counsel was entitled. This statement here followed by a response to interrogation with nothing more, is insufficient to form a basis for waiver."

366 F.2d at 840–41. See also *United States v. Clark,* 499 F.2d 802 (4th Cir. 1974).

350

all evidence[5] we cannot say that we are convinced beyond a reasonable doubt that the error did not affect the judgment.[6]

EAGEN, Justice (Dissenting).

The opinion of the majority proceeds upon the assumption that Bullard expressed through intermediaries, mainly Judge Dandridge and "Country" Robinson, a "clear desire not to be questioned until counsel was obtained for him—as he was constitutionally entitled to do" and that "Judge Dandridge conveyed this invocation of . . . rights to" police. This factual assumption is totally without support in the record.

The opinion of the hearing court following the suppression hearing states:

"There is little dispute about the facts. It clearly appears to the Hearing Judge that the defendant, 22 years of age, had decided to surrender to police but was apprehensive of his physical wellbeing if he did so unattended. He solicited the advice and aid of a friend, one Robinson, a gang control worker, who, in turn, solicited the intervention of the Honorable Paul A. Dandridge, Judge of the Municipal Court of Philadelphia County. Judge Dandridge arranged for the defendant to surrender to Detective Branche of the Philadelphia County Detective Office at a meeting with Judge Dandridge in the Judge's own chambers.

5. See generally, *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964); *Commonwealth v. Pierce,* 451. Pa. 190, 195, 303 A.2d 209, 212 (1973); *Commonwealth v. Yount,* 435 Pa. 276, 256 A.2d 464 (1969), cert. denied, 397 U.S. 925, 90 S. Ct. 918, 25 L.Ed.2d 104 (1970); *Commonwealth v. Simula,* 434 Pa. 219, 252 A.2d 575 (1969); *People v. Schader,* 62 Cal.2d 716, 44 Cal.Rptr. 193, 401 P.2d 665 (1965).

6. See, e. g., *Commonwealth v. Martinolich,* 456 Pa. 136, 160 n. 15, 318 A.2d 680, 693 n. 15, cert. denied, 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974); *Commonwealth v. Davis,* 455 Pa. 466, 467, 317 A.2d 218 (1974).

"At the meeting so arranged, Judge Dandridge himself read the defendant the standard warnings of his Constitutional privilege against self-incrimination required by *Miranda* and, in addition told Detective Branche that he understood the defendant's family were making efforts to retain counsel for him, by reason of which he, *Judge Dandridge, wished the police to conduct no interrogation of the defendant until he had spoken with counsel being retained, and so instructed the detective. Detective Branche responded that he would transmit the Judge's instruction, but that he knew the detectives in the Homicide Unit would disregard it, and interrogate notwithstanding. Detective Branche expressed the view that Judge Dandridge instead should instruct the defendant to decline to make any statement and thus halt interrogation. This the Judge did, forthwith.*

"Detective Branche took the defendant into custody, transported him from the Judge's chambers at One East Penn Square, opposite City Hall, to the Police Administration Building at 8th and Race Streets, and there repeated the Judge's instruction as to not interrogating the defendant to the receiving officer, Sergeant Green, who listened without comment. Sergeant Green said nothing about Judge Dandridge's instruction to the interrogating officers to whom he turned the defendant over. *Standard interrogation ensued, preceded by standard warnings given defendant, in response to which, prior to both oral and written statements, he waived his Constitutional privilege.*

"From both Judge Dandridge and the defendant's witness Robinson came testimony that the principal purpose of securing the Judge's intervention in arrangements for surrender was to insure the defendant's not being subjected to physical abuse.

"The defendant was clocked in at the Homicide Unit at 3:50 P.M. on April 21, 1970. His Constitutional

privileges were read to and waived by him at 4:10 P.M. Until 5:00 P.M. he was left unattended while other persons involved in the investigation were spoken to. Interrogation began at 5:00 P.M., continued to 6:15 P.M., was interrupted until 6:50 P.M. for the defendant to use the toilet, rest, and have some food, and was resumed until 7:45 P.M. This interrogation resulted in the oral statement here challenged. From 9:45 to 11:30 P.M. there was a second interrogation, preceded by standard warnings and the defendant's waiver of his Constitutional privileges, and during this period he gave the written signed statement of which suppression is now sought." [Emphasis added.]

Moreover, the opinion of the trial court en banc following motions for a new trial and in arrest of judgment completely agrees with the suppression hearing judge on the facts.

Nothing in the opinion of the supression hearing court, nor in the opinion of the trial court following motions in arrest of judgment and for a new trial, nor in the opinion of the majority indicates that Bullard ever expressed any desire to exercise his constitutional rights. Indeed, the testimony quoted by the majority opinion and the opinions of the suppression court and the trial court indicate only that Judge Dandridge did not want police to question Bullard, not that Bullard did not want to be questioned. Further, Deputy Chief Branche clearly pointed out to Judge Dandridge that the police would not consider themselves bound to follow his instructions and that he should advise Bullard to exercise his rights.[1] The Judge so advised Bullard. Yet, when asked for the *first* time if he wished to exercise his rights, Bullard

1. How this response, both candid and correct, since the Judge had no authority to control the actions of police and since nothing indicates Bullard had expressed to anyone a desire to exercise his rights, can be considered an "alarming disregard" for Bullard's rights defies comprehension.

clearly responded that he did not. Further, he then proceeded to answer police questions.

What these facts do indicate is that Bullard had the unusual advantage of being advised by a Judge of the Municipal Court, prior to arrest, that it would be advantageous to him to exercise his rights. Despite this advantage, Bullard clearly waived his rights. When the police first warned Bullard after he was taken to the Police Administration Building, Bullard's responses clearly indicated a waiver. Moreover, the responses to warnings were followed shortly by responses to other questions. On the record, the first and only time Bullard expressed *his* desire to exercise or not to exercise his rights, Bullard chose the latter. What, in fact, exists "in the record" to show that Bullard expressed a clear desire to anyone not to be questioned is not pointed out by the majority.[2] Indeed, it could not be pointed out because it quite simply is not present in the record.

It is true that the Commonwealth has the burden of proving by a preponderance of the evidence that an accused's waiver of his rights must be knowing, voluntary, and intelligent. Here Bullard was not only properly advised of his rights by the police, he was advised by a Judge of the Municipal Court, and further advised by that Judge that it would be to his advantage to exercise those rights. The opinion of the suppression court states that Bullard enlisted the aid of Judge Dandridge to insure he would not be subject to physical abuse. Nothing

---

**2.** Clearly, a judge learned in the law, could convey a clearer indication to the police officer that Bullard expressed a desire to exercise his constitutional rights, if that were in fact the situation. This is particularly true in light of the Judge's response when told by the police officer that Bullard would be questioned despite the Judge's instructions. It is inconceivable that had Bullard at any time expressed a desire to exercise his constitutional rights, Judge Dandridge would not have clarified his instructions to indicate this to the police officer after the officer's statement that the Judge's instructions would not be followed.

indicates Bullard enlisted the aid of Judge Dandridge to act as an intermediary in exercising his constitutional rights. Moreover, Bullard was twenty-two years of age at the time and clearly indicated he understood his rights when advised of them.

Admittedly, Bullard did inform the police officer while in Judge Dandridge's office that he was attempting to acquire counsel. But Bullard did not indicate that he did not want to be questioned until such counsel was obtained. This Court has ruled that a person who has already retained counsel may in the absence of counsel waive his right to have counsel present during questioning. *Commonwealth v. Hawkins*, 448 Pa. 206, 292 A.2d 302 (1972). It follows that where an accused is merely in the process of obtaining counsel, he too may knowingly, intelligently, and voluntarily waive his constitutional rights. Since an accused may waive his rights under these circumstances, it only remains to determine if Bullard did so here.

The majority states and rejects the two possible ways by which the Commonwealth attempted to show Bullard waived his rights, mainly, Bullard's responses to the *Miranda* warnings given by the police which indicated a waiver and Bullard's answering of questions following the warnings. In doing so, the majority treats the "one word answers . . . to the pro forma questions in the *Miranda* warnings" and Bullard's answering of subsequent questions as if they existed independently. In dealing with the answering of questions, the majority quotes from *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to the effect that silence in response to warnings followed by the answering of questions is a silent record from which the presuming of a waiver is impermissible. But this is not a silent record. Moreover, in the sentence immediately preceding the pas-

sage quoted by the majority, the United States Supreme Court stated:

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver."

*Miranda v. Arizona,* supra at 475, 86 S.Ct. at 1628.

In response to police questions prior to interrogation, Bullard expressly stated that he understood he did not have to say anything, that anything he said could and would be used against him, that he did not want to remain silent, that he understood he had a right to talk to a lawyer before being questioned, that the lawyer would be provided free of charge if he could not afford one, that he did not want to talk to a lawyer, that he did not want to have a lawyer present while he was asked questions, and that he was willing to answer questions of his own free will, without fear or force, or without any threats or promises having been made to him. Shortly thereafter, Bullard provided the police with a statement. Thus, Bullard clearly waived his rights in a manner specifically approved by *Miranda* and the interrogation was permissible.

Since the facts do not support an exercise of constitutional rights by Bullard at any time, and since his actions and statements constitute a waiver of his constitutional rights, I cannot subscribe to the opinion of the majority.

I dissent.

JONES, C. J., and POMEROY, J., join in this dissent.