541 A.2d 319

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Kathleen DOLLMAN, Appellee.**

Supreme Court of Pennsylvania.

Argued March 9, 1988.

Decided May 20, 1988.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Deputy Dist. Atty., Dara A. DeCourcy, Asst. Dist. Atty., Pittsburgh, for appellant.

Timothy E. Finnerty (Court–Appointed), Pittsburgh, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

On December 20, 1984, in the Court of Common Pleas of Allegheny County, the appellee, Kathleen Dollman, was convicted of voluntary manslaughter. A sentence of three to six years imprisonment was imposed. An appeal was taken to the Superior Court, whereupon the conviction was reversed and a new trial was granted, 355 Pa.Super. 108, 512 A.2d 1234. The instant appeal ensued.

The incident from which the conviction arose was one in which Dollman shot and killed her husband. At trial, Dollman claimed that she was a "battered wife,"[1] and that

1. Although it is not a recognized defense to a homicide charge in Pennsylvania to prove merely that one was what is termed a "battered spouse," it is established that evidence of the nature of a marital relationship, including evidence of past physical violence between spouses, is admissible for the purpose of proving motive. *Common-*

the killing was committed to defend herself and her two children from harm. The bizarre and gruesome facts of this case are as follows.

In June, 1980, a human skull, containing a bullet hole, was found in some grass near Dollman's home in the City of Pittsburgh. The skull was found by a child, who placed the skull in a shopping bag and took it home to present it to a friend or babysitter. Police were summoned. Residents of the neighborhood, including Dollman, were questioned by police in an attempt to identify the skull, but no identification was made.

Nearly four years later, in February, 1984, police received certain investigative information from a social worker, causing them to conduct pathological examinations of the skull to determine whether the skull was that of Dollman's husband. Based upon x-ray pictures taken years before, the skull was positively identified as having been that of Dollman's husband. Dollman was arrested, and she subsequently confessed that, in December, 1979, she had killed her husband.

Dollman claimed that the homicide was a justifiable one, committed to protect herself and her children from harm. She testified that she and her children had on many occasions been severely beaten and abused by her husband, and that, on the day of the killing, her husband had gone on a drunken rampage involving such beatings, causing her to fear for the lives of herself and her children. Indeed, there was testimony that, at various times during her five-year relationship with her husband, who happened to be a motorcycle gang member who commonly wore chains and a spiked dog collar and worshiped "Odon, God of the Bikers," Dollman was threatened with death, tied and hung in the basement, sexually abused, punched until her bones were fractured, assaulted with a pistol and a knife, shot at, pummelled with a lead-filled pick handle, beaten with a steel

wealth v. *Albrecht,* 510 Pa. 603, 619, 511 A.2d 764, 772 (1986), cert. denied, —— U.S. ——, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987); *Commonwealth v. Ulatoski,* 472 Pa. 53, 61, 371 A.2d 186, 190 (1977).

rake, strangled to the point of unconsciousness, forced to sleep in a dog house, etc. There was also testimony that Dollman's husband had threatened and abused the children in the household, as well as performed other acts of cruelty, such as cutting the head off the family's Doberman pinscher. Dollman testified that, despite all of these acts, she still loved her husband.

Nevertheless, Dollman confessed that on the day in question, during an interlude in the beatings when her husband was resting or sleeping on the living room couch, she shot him with a rifle. The first time she pulled the trigger the gun did not fire, but, with the assistance of her thirteen year-old son, co-defendant Jack Beauchamp, who was present in the living room at the time, she succeeded in releasing the safety latch and firing the gun. The victim was shot at point-blank range in the back of the head. Dollman cleaned the resulting bloodstains from fabrics in the living room. Then, with the assistance of her son, Dollman moved the victim's body to a sub-basement of her home, and, over the next several days, Dollman, her son, and a fifteen year-old neighbor dug a hole in the sub-basement and buried the body. To prevent the victim's relatives from finding out what she had done, she made up a story that her husband had moved to California.

Several months later Beauchamp became concerned that the bullet was still in the victim's head, so, with the assistance of yet another child from the neighborhood, he uncovered part of the victim's body and cut off its head with a machete. The head was then placed by Beauchamp in a plastic bucket filled with water. Beauchamp was planning to keep the head, because he found it "fascinating." In June of 1980, however, Beauchamp's dog overturned the plastic bucket and carried away the head, eventually leaving it outdoors near the Dollman residence. After the head was discovered by a child, and placed in a shopping bag, police converged on the scene. Seeing the police outside her home, Dollman went outside and looked in the shopping bag. At that time she merely said, "Oh, somebody's head,"

for she denies having known at that time that her husband's body had been decapitated. Moments later, however, some children told her that the head belonged to her husband, and, feeling alarmed at this news, Dollman and Beauchamp drove to Ohio later that night and threw the rifle used in the killing into a lake. Many months subsequently passed without further developments in the case.

In the summer of 1981 or 1982, the exact date being unclear in the record, Dollman met and developed a relationship with a man, Joseph Orlando, who soon commenced to live in her house. It was observed by Orlando that Dollman was suffering from a great deal of mental distress, as evidenced by nervousness, fear, insomnia, etc. When Orlando inquired as to the reasons for this distress, Dollman explained that she had shot one of her many previous husbands, and that the dead husband was buried in the sub-basement. Upon hearing Dollman's claim of having shot her sleeping husband, Orlando was incredulous, but, after a while, he proceeded to dig in the sub-basement just to prove that she was merely joking. To his surprise, he uncovered a body.

Next, working intensively over a period of two days, Dollman and Orlando exhumed all of the body parts and clothing and burned them in an upstairs fireplace. A gold ring, bearing the inscription "love," was removed from the body and sold by Dollman at a pawn shop. When they had completed the task of burning the body, there were still some remains left in the fireplace, so these were compacted into a small brown bag and put out for the garbage collectors.

The sole issue raised in this appeal is whether the Superior Court erred in reversing Dollman's conviction and remanding for a new trial, based upon its conclusion that the trial court improperly admitted the evidence concerning exhumation, burning, and disposal of the victim's body. The Superior Court reasoned that evidence of what was done with the body by Dollman and Orlando approximately two to three years after the crime was so highly inflamma-

tory, and of so little probative value, that reversal of the trial court's ruling on admissibility was required. See *Commonwealth v. Hickman*, 453 Pa. 427, 434, 309 A.2d 564, 568 (1973) (logically relevant evidence excluded where probative value is outweighed by unfair prejudice).

It is well settled, however, that "admission of evidence which may tend to inflame the minds of the jury is admissible at the trial court's discretion, and an appellate court will reverse only upon a showing of abuse of discretion." *Commonwealth v. Bartlett*, 446 Pa. 392, 400, 288 A.2d 796, 799–800 (1972). The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value, and it is not for an appellate court to usurp that function. *Id.* See also *Commonwealth v. Cargo*, 498 Pa. 5, 15, 444 A.2d 639, 644 (1982) ("A trial court's rulings on evidentiary questions, moreover, 'are controlled by the discretion of the trial court and this Court will reverse only for clear abuse of that discretion.' *Commonwealth v. Scott*, 469 Pa. 258, 270, 365 A.2d 140, 146 (1976)."); *Commonwealth v. McCutchen*, 499 Pa. 597, 454 A.2d 547 (1982) (trial court's admission of potentially inflammatory evidence reviewed by abuse of discretion standard).

As the Superior Court noted in its decision, evidence of disposition of the victim's body satisfied the requirement that evidence be relevant in order to be admissible at trial. Clearly, evidence of acts to conceal a crime, such as disposing of the victim's body, are relevant to prove the accused's intent or state of mind. As stated in *Commonwealth v. Robson*, 461 Pa. 615, 628, 337 A.2d 573, 579 (1975), cert. denied, 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975), "[A]ctions subsequent to the killing in attempting to destroy or dispose of evidence could have been interpreted by the jury as evidencing consciousness of guilt." Indeed, evidence of disposal of a victim's body is analogous to evidence of an accused's flight or concealment, and this Court has long recognized the relevance and admissibility of the latter types of evidence which advance an inference of guilt. *Commonwealth v. Colson*, 507 Pa. 440, 464–465, 490 A.2d 811, 823–824 (1985), cert. denied, 476 U.S. 1140, 106

S.Ct. 2245, 90 L.Ed.2d 692 (1986); *Commonwealth v. Coyle,* 415 Pa. 379, 393, 203 A.2d 782, 789 (1964). See also *Commonwealth v. Hickman,* 453 Pa. at 433, 309 A.2d at 567–568 ("Evidence is relevant if it tends to establish some fact material to the case or tends to make facts at issue more or less probable.").

Although Dollman admitted to having killed her husband, the pivotal issue at trial was her state of mind at the time of the killing. The prosecution attempted to prove that Dollman was guilty of murder of the first degree, while the defense sought to establish that the killing was a justifiable homicide committed in self-defense. For this reason, evidence of Dollman's disposal of the body supplied important proof relative to whether she acted with malice. Human experience teaches that persons who commit justifiable homicides, without malice, do not ordinarily feel compelled to destroy the victim's body. Rather, it is those who harbor a guilty conscience, believing their acts not to have been justified, who are most likely to conceal evidence of their deeds. Further, it is important to note that the baneful manner in which Dollman disposed of her husband's body could very reasonably have been taken by the jury as evidencing Dollman's attitude towards her husband during his lifetime, inferring a hatred that strongly supported the prosecution's contention that the killing was committed with malice.

In holding that the evidence should have been excluded, the Superior Court reasoned that, because two or three years had elapsed from the time of the killing until disposal of the body, and because the prosecution had introduced other evidence supporting an inference that Dollman had a guilty conscience, proof of the final disposition of the victim's remains was unnecessary to the prosecution's case. Further, it was held that any probative value to be accorded such evidence was outweighed by its inflammatory effect. We do not agree.

The fact that considerable time had passed from the time of the killing until disposal of the body does not diminish the strength of the inference to be drawn from Dollman's

actions. Whether the body was destroyed immediately after the killing, or three years later, an important inference of guilt must be recognized as arising therefrom. Further, although there was indeed other evidence of Dollman's guilty conscience, to wit, the fact that she did not report the death of her husband, that she buried the body, that she told her husband's relatives that he went to California, and that she threw away the gun used in the killing, evidence of the final disposition of the body was substantial in its probative value and should not have been regarded as, in effect, merely cumulative.

Whether Dollman acted with malice, or in self-defense, was a strongly contested and pivotal issue at trial. The defense presented extensive testimony from a number of witnesses regarding beatings inflicted upon Dollman, attempting thereby to advance a theory that the homicide was committed in self-defense. Anticipating this testimony, which, in itself, could be regarded as cumulative, the prosecution no doubt believed it necessary to produce all of the available evidence supporting the contrary theory, i.e., that the homicide was committed with malice. Testimony pertaining to disposition of the victim's body constituted an important part of that evidence.

Granted, it is an unpleasant fact that remains of the victim's body were burned in a fireplace and put out for the garbage collectors, but that fact is not so shocking and inflammatory as to compel a conclusion that the probative value of the evidence was outweighed by its prejudicial effect. Applying the appropriate standard of appellate review, discussed supra, it cannot be said that the trial court committed an abuse of discretion in admitting the challenged evidence. Indeed, taking into account the gruesome nature of this entire case, and the lack of probability that the jury would be unduly influenced by just one among many distasteful facts, and considering the probative value of the evidence, there appears an ample basis for the trial court's ruling. In holding to the contrary, the Superior Court accorded inadequate deference to the trial court's proper function of balancing the possible prejudicial and

probative effects of the evidence in question. See *Commonwealth v. Bartlett,* supra. Accordingly, the order of the Superior Court, reversing the judgment of sentence and remanding for a new trial, must be reversed.[2]

Order reversed.

LARSEN, J., files a dissenting opinion.

LARSEN, Justice, dissenting.

I dissent and would affirm on the basis of the Superior Court opinion authored by Judge Joseph A. Del Sole.

In addition, with regard to footnote 1 of the majority opinion, the majority supports the proposition that evidence relating to the "battered wife syndrome" is admissible for purposes of prosecuting a homicide case, but that the "battered spouse syndrome" may not be used as a defense to a homicide charge. I disagree and would recognize the "battered spouse syndrome" as a defense to a homicide in this jurisdiction.

2. In view of our determination that the trial court did not abuse its discretion in admitting the challenged evidence, we need not address the Commonwealth's alternate contention that admission of the evidence was harmless in its effect, where it was allegedly cumulative as to evidence offered by the defense, and where a verdict of voluntary manslaughter rather than murder was returned by the jury.