J-S56030-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JORGE DANIEL ROMERO-DIAZ | |
| Appellant | No. 220 MDA 2014 |

Appeal from the Judgment of Sentence of January 3, 2014
In the Court of Common Pleas of Berks County
Criminal Division at No.: CP-06-CR-0000763-2013

BEFORE: PANELLA, J., WECHT, J., and PLATT, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED NOVEMBER 20, 2014**

Jorge Daniel Romero-Diaz appeals from the judgment of sentence entered on January 3, 2014, following a stipulated bench trial after which he was convicted of driving under the influence ("DUI")—highest rate, driving while operating privilege is suspended or revoked ("DUS"), and accidents involving damage to unattended vehicles or property.[1]  Specifically, Romero-Diaz challenges the denial of his pretrial motion to suppress.  After careful review, we reverse the order denying Romero-Diaz's motion to suppress his confession, we vacate his judgment of sentence, and we remand for further proceedings consistent with this memorandum.

---

[*]    Retired Senior Judge assigned to the Superior Court.

[1]    75 Pa.C.S.A. §§ 3802(c), 1542(a), and 3745(a), respectively.

The trial court set forth the following statement of facts in its April 14, 2014 opinion:

On October 7th, 2012, Trooper[s] Michael Schatzmann and Jason Hope [were] dispatched to a vehicle crash in the area of 2394 E. Main St[.], Union Township, Berks County. While [en] route to the crash, Trooper Schatzmann observed [Romero-Diaz] lying on the south side of the roadway on an embankment approximately one mile west of the crash scene.

The Troopers pulled over to investigate the situation. As they approached [Romero-Diaz], they saw another individual (later identified as the passenger) also lying alongside of the roadway. The passenger immediately stated "that [Romero-Diaz] was operating the vehicle and they were just trying to made it back to his residence in Birdsboro, Pa." At this point Trooper Schatzmann testified that he smelled a very strong odor of an alcoholic beverage emanating from [Romero-Diaz's] person. He also observed [Romero-Diaz's] eyes to be bloodshot and glassy.

Trooper Schatzmann proceeded to ask [Romero-Diaz] if he had consumed any alcoholic beverages. [Romero-Diaz] admitted that he drank "3 or 4 beers[."] [Romero-Diaz] also stated that "he did not consume any alcoholic beverages since the time of the crash." The Troopers testified they patted down both individuals to make sure they were not armed and dangerous. A set of car keys was found on [Romero-Diaz]. [Romero-Diaz] and [the] passenger were handcuffed (detained for safety) and transported to the scene of the crash. Upon arrival [Romero-Diaz]'s handcuffs were removed to continue the investigation. At this time [Romero-Diaz] started to cry. Trooper Hope approached [Romero-Diaz] again and asked him if he was operating the vehicle. [Romero-Diaz] answered "yes."

At this point, [Romero-Diaz] said that his driver's license was suspended and that the vehicle was a rental belonging to the passenger. [Romero-Diaz's] footing was unstable and he swayed side to side. [Romero-Diaz] had difficulty keeping his eyes open and answering questions. Trooper Schatzmann asked [Romero-Diaz] to perform a field sobriety test. [Romero-Diaz]

complied with a HGN[2] and failed the test given. Due to the dangerous location on the roadway, no further field sobriety tests were administered. [Romero-Diaz] was placed under arrest for DUI and transported to St. Joseph's Hospital for chemical testing. [Romero-Diaz] agreed to the blood test at approximately 6:30 a.m. [His] BAC results were .202%.

Trial Court Opinion ("T.C.O."), 4/14/2014, at 3-4.

The Commonwealth filed a criminal information on October 7, 2012, and Romero-Diaz filed a motion to suppress and a petition for writ of *habeas corpus*. On May 22, 2013, the trial court held a hearing on the pretrial motions, and ultimately denied them on August 28, 2013. On January 3, 2014, the court held a stipulated bench trial after which the court found Romero-Diaz guilty of the abovementioned counts and sentenced him to county confinement of not less than seventy-two hours nor more than six months, plus costs and fines. Romero-Diaz filed a notice of appeal on the same day. On March 5, 2014, the court ordered Romero-Diaz to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and he timely complied on March 26, 2014. On April 14, 2014, the trial court entered its opinion pursuant to Pa.R.A.P. 1925(a).

Romero-Diaz raises the following issues for our review:

1. Whether the [c]ourt erred in denying [Romero-Diaz's] suppression motion in that:

---

2 To perform a horizontal gaze nystagmus ("HGN") test, an officer asks the driver to follow a penlight with his eyes, and observes the angle at which the eye twitches.

a. The Troopers lacked the requisite reasonable suspicion and/ or probable cause because the facts known to the Troopers when ordering [Romero-Diaz] to come down from the hill on the side of the road did not rise to the requisite level of reasonable suspicion that criminal activity was afoot or probable cause that a crime was occurring or had occurred in violation of [Romero-Diaz's] right under Article I Section 8 of the Constitution of the Commonwealth of Pennsylvania and the Fourth and Fourteenth Amendments to the Constitution of the United States.

b. The searching Trooper lacked reasonable suspicion that [Romero-Diaz] was armed and dangerous to conduct a protective pat-down of [Romero-Diaz's] person in violation of [his] rights under Article I Section 8 of the Constitution of the Commonwealth of Pennsylvania and the Fourth and Fourteenth Amendments to the Constitution of the United States, and any evidence obtained from the illegal pat-down must be suppressed as fruits of an illegal search, specifically the keys recovered from [Romero-Diaz's] person as it was not readily apparent the keys were a dangerous weapon nor is it criminal to possess keys.

c. The detention of [Romero-Diaz] after the initial stop was not supported by the requisite probable cause, as the Troopers' actions of handcuffing [Romero-Diaz], placing [Romero-Diaz] in the back of the marked police car, and transporting [Romero-Diaz] to the scene of the accident, effectively arose to the level of an arrest, and this arrest was not supported by probable cause in violation of [Romero-Diaz's] right under Article I Section 8 of the Commonwealth of Pennsylvania and the Fourth and Fourteenth Amendments to the Constitution of the United States.

d. The Troopers failed to apprise [Romero-Diaz] of his rights against self[-]incrimination pursuant to *Miranda*[3] as the interrogation of [Romero-Diaz] in front of the police car followed the handcuffing of [Romero-

_____

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Diaz], placing [Romero-Diaz] in the back of the marked police car and transporting [Romero-Diaz] to the scene of the crash, subjecting [Romero-Diaz] to a custodial interrogation, as no ***Miranda*** warnings were given any statements made by [Romero-Diaz] stemming from this questioning must be suppressed.

Romero-Diaz's Brief at 6-7.

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

***Commonwealth v. Thompson***, 93 A.3d 478, 484 (Pa. Super. 2014) (citations omitted).

In his first issue, Romero-Diaz contends that "[t]he Trooper's investigative detention . . . was not supported by reasonable suspicion." Romero-Diaz's Brief at 16. Specifically, he argues that "at the time the Troopers came upon Romero-Diaz there [were] no facts connecting him in any way to the vehicle crash" to which the Troopers had been dispatched, and there were no "specific or articulable facts" from which they could reasonably suspect that criminal activity was afoot. ***Id.*** at 19. We disagree.

- 5 -

[I]n assessing the lawfulness of citizen/police encounters, a central, threshold issue is whether or not the citizen-subject has been seized. Instances of police questioning involving no seizure or detentive aspect (mere or consensual encounters) need not be supported by any level of suspicion in order to maintain validity.[1] Valid citizen/police interactions which constitute seizures generally fall within two categories, distinguished according to the degree of restraint upon a citizen's liberty: the investigative detention or **Terry**[4] stop, which subjects an individual to a stop and a period of detention but is not so coercive as to constitute the functional equivalent of an arrest; and a custodial detention or arrest, the more restrictive form of permissible encounters. To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion; whereas, a custodial detention is legal only if based on probable cause. To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

> [1] **See generally Florida v. Bostick**, 501 U.S. 429, 434-35 (1991) (explaining that, even when the officers have no basis for suspecting criminal involvement, they may generally ask questions of an individual "so long as the police do not convey a message that compliance with their request is required"); **Immigration and Naturalization Serv. v. Delgado**, 466 U.S. 210, 216-17 (1984); [**Florida v.**] **Royer**, 460 U.S. [491,] 497-98 [(1983)] ("if there is no detention—no seizure within the meaning of the Fourth

---

4    **Terry v. Ohio**, 392 U.S. 1 (1968).

Amendment—then no constitutional rights have been infringed"); ***Commonwealth v. Ellis***, 662 A.2d 1043, 1047 (1995).

***Commonwealth v. Strickler***, 757 A.2d 884, 889-90 (Pa. 2000) (some citations and footnotes omitted; some citations modified). In the instant case, the record supports the trial court's conclusion that Romero-Diaz and his passenger were subject to an investigative detention.

Here, Trooper Schatzmann testified at the pretrial hearing that he and Trooper Hope received a call from dispatch at approximately 4:30 a.m. on October 7, 2012, that there had been a crash and the vehicle had been abandoned. About a mile from the scene, they saw Romero-Diaz and his passenger lying in the brush near the road.

> Q. Okay. So at this point when you received a call from dispatch, you weren't sure when the accident happened, you just know there was a 9-1-1 call of an accident and you were responding to that 9-1-1 call?
>
> A. If I recall correctly, a 9-1-1 call was made in a vehicle accident happened, it wasn't hours ago, it was just within the last five minutes. She called in, they heard a crash, they saw a vehicle, didn't see anybody around the vehicle.
>
> Q. Okay.
>
> A. While we were approaching the vehicle, we had our eyes peeled for anyone that may be walking or involved.

N.T. at 36.

Trooper Schatzmann and Trooper Hope saw someone lying on an embankment on the side of the road, later determined to be Romero-Diaz, who stood when they stopped their patrol car. ***Id.*** at 48-49. The Troopers

then saw a second man, the passenger, further up the embankment, and instructed him to come down to where they were standing. *Id.* at 49. As the second man approached the Troopers, he insisted, without being prompted, that he had not been driving and that Romero-Diaz was the driver. Trooper Hope observed at that time that Romero-Diaz appeared "[h]ighly intoxicated, [with a] strong odor of alcoholic beverage emanating about his person. His speech was slurred. [His e]yes were blood shot. He had a hard time keeping his eyes open." *Id.* at 50.

Accordingly, at the time the Troopers asked Romero-Diaz and his passenger to come down from the embankment, they knew that there had been an accident with an abandoned vehicle, they had discovered two men, one visibly intoxicated, lying on the side of the road near the accident site, and it was 4:30 in the morning. Thus, the record supports the suppression court's findings when it held as follows:

> For safety reasons, the Troopers did have specific and articulable facts along with rational inferences to follow the next step for a *Terry* pat down. 1) They received a dispatch call for an investigation in that area. 2) They saw two men lying on the side of the road close to the crash scene. 3) Information from one of the men about operating a vehicle. 4) Strong signs that [Romero-Diaz] was under the influence of alcohol. 5) And it was dark outside at approximately 4:30 a.m.

Findings of Fact at 6. The investigative detention of Romero-Diaz and his passenger was supported by a reasonable and articulable suspicion that criminal activity was afoot, and thus, Romero-Diaz's first issue does not merit relief. *Strickler*, 757 A.2d at 889-90.

- 8 -

Second, Romero-Diaz contends that "[t]he troopers had no reasonable suspicion to believe that Romero-Diaz was armed and dangerous; therefore, the *Terry* search of Romero-Diaz was illegal and all physical evidence seized as a result of the search must be suppressed." Romero-Diaz's Brief at 19. Specifically, he argues that the Commonwealth failed to carry its burden of proof to support the warrantless search and seizure of Romero-Diaz's keys because the Troopers "were not in a lawful position to detect the presence of contraband" through the plain feel doctrine, and because keys are not contraband. *Id.* at 21. We disagree.

> To conduct a pat down for weapons, a limited search or "frisk" of the suspect, the officer must reasonably believe that his safety or the safety of others is threatened. If either the seizure (the initial stop) or the search (the frisk) is found to be unreasonable, the remedy is to exclude all evidence derived from the illegal government activity.
>
> The *Terry* totality of the circumstances test applies to traffic stops or roadside encounters in the same way that it applies to typical police encounters. . . . Indeed, as we have observed, roadside encounters, between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect.

*Commonwealth v. Simmons*, 17 A.3d 399, 403 (Pa. Super. 2011) (citations omitted).

> Since the sole justification for a *Terry* search is the protection of the police and others nearby, such a protective search must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. Thus, the purpose of this limited search is not to discover evidence, but to allow the officer to pursue his investigation without fear of violence. If the protective search goes beyond what is necessary to determine if the suspect is

armed, it is no longer valid under **Terry** and its fruits will be suppressed.

**Commonwealth v. Guillespie**, 745 A.2d 654, 657-58 (Pa. Super. 2000); **see also Commonwealth v. Rehmeyer**, 502 A.2d 1332, 1335 (Pa. Super. 1985) ("[If] probable cause to arrest exists, but the officer does not effectuate the arrest, the officer may nevertheless conduct a protective pat-down search when he decides to transport the individual in the patrol car.").

Here, Trooper Schatzmann stated that "[a]t the first time we detained [Romero-Diaz and the passenger] we explained to them they are not under arrest, they were being detained for our safety and transported to the crash scene." **Id.** at 19, 51. As the Trooper observed, "[i]t was dark, there's no street lights in that location. . . . So we weren't sure if they were armed or anything like that." **Id.** at 11; **see id.** at 14 (describing the embankment as "a very vulnerable section of that road which is a bad road to begin with"). Likewise, Trooper Hope observed Romero-Diaz's visible intoxication and determined that:

> [W]e needed to get to the crash scene to further [the] investigation. So with protocol we handcuffed both individuals, told them they were not under arrest but needed to go back to the crash scene. At that point we patted them both down. [Romero-Diaz] had keys to a vehicle in the back I believe it was right pocket. Put them in the patrol vehicle and we resumed to where the crash was.
>
> Q.    And who recovered those keys?
>
> A.    I did.

- 10 -

N.T. at 51. Trooper Hope further explained that their marked vehicle was open and did not have a cage separating the backseat. *Id.* at 60.

For their own safety, the Troopers were entitled to perform a limited frisk for weapons before securing Romero-Diaz and his passenger in their vehicle for transport. Thus, the Troopers had lawful access to pursue a plain feel patdown of Romero-Diaz, at which point Trooper Hope felt a "bulge" that was revealed to be his keys. The Troopers' search ended at that point, and was "strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Guillespie*, 745 A.2d at 657-58. Therefore, the record supports the trial court's conclusion that, in the totality of the circumstances, "[t]he keys found [are] not fruits of an illegal search and should not be suppressed." T.C.O. at 8.

Furthermore, Romero-Diaz claims that "once Trooper Hope realized the object was keys he would have to further investigate to identify these keys as capable of operating the vehicle involved in the crash." Romero-Diaz's Brief at 22. However, this is speculation that is unsupported by the record. Neither Trooper stated that Romero-Diaz's keys were used to further the investigation in any way. *See* N.T. at 54-56 (describing events at accident scene, which included Romero-Diaz's confession, failed HGN test, and arrest, and the Troopers calling a tow truck). In fact, Romero-Diaz's own counsel solicited the information about his keys; the Commonwealth did not contend that they were contraband or that they led to the discovery of any evidence. *Id.* at 51-52.

- 11 -

We find the circumstances of Romero-Diaz's claim substantially similar to those in **Commonwealth v. Toro**, 638 A.2d 991, 1002 (Pa. Super. 1994):

> Appellant contends that the keys should have been suppressed because the police lacked the requisite probable cause to arrest appellant. We are somewhat perplexed by appellant's argument. A review of the record demonstrates that the Commonwealth never introduced into evidence the keys taken from appellant. Because the keys were not used at trial the evidence was, in effect, suppressed by the Commonwealth. **See Commonwealth v. Baker**, 531 Pa. at 552, 614 A.2d at 668 (omission of evidence by the Commonwealth is the equivalent of suppression).

**Commonwealth v. Toro**, 638 A.2d 991, 1002 (Pa. Super. 1994) (footnote omitted); **see also Commonwealth v. Ellis**, 608 A.2d 1090, 1092 (Pa. Super. 1992) ("[T]he primary purpose of the exclusionary rule is to deter unlawful police conduct.").

Here, the Commonwealth made no claim that the keys found on Romero-Diaz belonged to the vehicle abandoned at the scene of the accident. In addition, as previously stated, the Troopers were entitled to take security measures to remove objects from Romero-Diaz that could potentially be used as a weapon while he was placed in their open police vehicle for transportation purposes. **Guillespie**, 745 A.2d at 657-58. Moreover, suppression of the keys would not have affected the case because no evidence was derived from their seizure. **See Simmons**, 17 A.3d at 403; **Ellis**, 608 A.2d at 1092. Thus, Romero-Diaz's second issue does not merit relief.

Third, Romero-Diaz claims that "[t]he Troopers' detention of Romero-Diaz was overly coercive such that it constituted an illegal arrest that was not supported by probable cause." Romero-Diaz's Brief at 23. Specifically, he contends that no exigent circumstances were present which would justify his transportation to the accident scene, and thus his investigative detention rose to the level of an illegal arrest. *Id.* at 26-27. We disagree.

> Police detentions become custodial, therefore requiring probable cause, when, under the totality of the circumstances, the detention becomes coercive to the extent it functions as an arrest.
>
> The factors to be used to determine whether the detention has become an arrest are[:]
>
>> The basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

*Commonwealth v. Revere*, 814 A.2d 197, 200 (Pa. Super. 2002) (citations omitted); *see also Commonwealth v. Douglass*, 539 A.2d 412, 421 (Pa. Super. 1988) (citing cases).

> In *Lovette*, our Supreme Court held that placing defendant and his companions in a police vehicle and transporting them to the scene of an offense, without their consent and without exigent circumstances, constituted an illegal arrest without probable cause and that evidence gained as a result of the arrest must be suppressed notwithstanding the Commonwealth's contention that the seizure was intended to serve investigative purposes rather than to arrest and charge the suspect.

*Commonwealth v. White*, 516 A.2d 1211, 1214 (Pa. Super. 1986) (citing *Commonwealth v. Lovette*, 450 A.2d 975, 980 (Pa. 1982) (finding no exigent circumstances where "[t]he police had the option of detaining the suspects at the site of the initial encounter and either bringing the complainant to the site for his identification of the questioned articles or taking those items to him.")). However, "when such an action is justified, placing a suspect into a police vehicle in order to transport him to the scene is not an arrest and need not be supported by probable cause. Indeed, what *Lovette* stresses is that any intrusion upon a person's liberty must be justified." *Revere*, 814 A.2d at 200.

Here, at the suppression hearing, the Troopers testified that they believed it was too dangerous to remain at the location where they found Romero-Diaz and his passenger because they were "at a very vulnerable section of that road which is a bad road to begin with, no street lights." N.T. at 14; *see id.* at 11. As previously discussed, due to Romero-Diaz's appearance of intoxication, his passenger's protests that Romero-Diaz had been driving, the close proximity of Romero-Diaz and the passenger to the crash scene, and the late hour, the Troopers had reasonable suspicion to believe that criminal activity was afoot for purposes of conducting a *Terry* investigative detention. *Id.* at 52. Although Romero-Diaz and his passenger were visibly intoxicated, there is no allegation that the Troopers used force when patting down and handcuffing them for the Troopers' safety while transporting them for "[m]aybe a minute" to the scene of the crash.

- 14 -

*Id.* Furthermore, upon arrival at the crash scene, the Troopers removed Romero-Diaz from their vehicle and removed his handcuffs, telling him that he was not under arrest while they continued their investigation by speaking to the homeowners who reported the crash and gathering information from the vehicle. *Id.* at 53-54.

We conclude, based upon the totality of the circumstances, that the Troopers were justified in transporting Romero-Diaz and his passenger the short distance to the crash site, and that this transportation did not rise to the level of an arrest. *See Revere*, 814 A.2d at 200. Unlike in *Lovette*, *supra*, the Troopers did not have the option of detaining Romero-Diaz and his passenger on the embankment because it was unsafe and there were no other troopers dispatched to the scene, and the Troopers determined that they were unable to continue their investigation without proceeding to the crash site. *See Lovette*, 450 A.2d at 980. Thus, exigent circumstances existed that justified the transportation of Romero-Diaz and his passenger, which the Troopers executed in a minimally-invasive manner. *See White*, 516 A.2d at 1214. Accordingly, the record supports the trial court's denial of suppression on this ground. *Thompson*, 93 A.3d at 484. Romero-Diaz's third issue does not merit relief.

We now turn to the admissibility of Romero-Diaz's confession made to the Troopers at the scene of the accident. In his fourth issue, Romero-Diaz argues that he "was in custody for the purposes of *Miranda*; therefore, his statements were illegally procured and must be suppressed." Romero-Diaz's

Brief at 29. He asserts that, in the totality of the circumstances, he was "badgered and coerced" into confessing, and had a clear right to have been presented with his *Miranda* rights or have his statements suppressed. *Id.* at 31. We agree that Romero-Diaz's *Miranda* rights should have been administered prior to questioning him.

> Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of [his] *Miranda* rights. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [his] freedom of action in any significant way. [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. Thus, [i]nterrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect. [I]n evaluating whether *Miranda* warnings were necessary, a court must consider the totality of the circumstances. In conducting the inquiry, we must also keep in mind that not every statement made by an individual during a police encounter amounts to an interrogation. Volunteered or spontaneous utterances by an individual are admissible even without *Miranda* warnings.
>
> > Whether a person is in custody for *Miranda* purposes depends on whether the person is physically denied of [his] freedom of action in any significant way or is placed in a situation in which [he] reasonably believes that [his] freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes [his] freedom of action is being restricted.
> >
> > Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so

- 16 -

> coercive as to constitute the functional equivalent of arrest.
>
> Thus, the ultimate inquiry for determining whether an individual is in custody for **Miranda** purposes is whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

**Commonwealth v. Williams**, 941 A.2d 14, 30-31 (Pa. Super. 2008) (citations omitted); **compare Commonwealth v. Gonzalez**, 546 A.2d 26 (Pa. 1988) (holding that officer was permitted to ask "what happened" at the scene of a fatal car accident where driver was exhibiting indicia of intoxication), **with Commonwealth v. Meyer**, 412 A.2d 517, 518 (Pa. 1980) (holding that appellant placed in police vehicle for thirty minutes before questioning was subject to custodial detention).

Romero-Diaz objects to the admission of his confession, made at the scene of the accident, that he had been driving the abandoned vehicle. Romero-Diaz's Brief at 31. As previously discussed, Romero-Diaz was subjected to an investigative detention when the Troopers transported him to the scene. At the suppression hearing, Trooper Hope testified:

> Q.    When you get to the crash scene what occurs; what did you do first?
>
> A.    Took [Romero-Diaz] out of the vehicle. We separated both of them, we kept the passenger inside the vehicle. We took the handcuffs off [Romero-Diaz] because we told him he wasn't under arrest. Then we continued our investigation from there.
>
> Q.    What specifically did you do in that investigation; what are you investigating?
>
> A.    Well, we were investigating the crash, who was operating the vehicle, trying to determine whether there's witnesses at the

- 17 -

crash scene, make sure the safety of the crash scene, make sure the vehicle was not blocking anything, if we needed fire/EMS.

Q. And what specifically did you do when you get to that scene; this is 2394 East Main Street in Union Township?

A. I proceeded and the majority of what I did, I gathered information from the vehicle. Initially when I got there I approached the property owners and I spoke with them.

Q. And when you go to speak to them where is [Romero-Diaz], if you are aware?

A. From what I remember I think he is in front of our patrol car[.]

Q. Outside of the patrol car?

A. Yes.

Q. And is he with anybody?

A. Trooper Schatzmann.

Q. And after speaking—how long are you with the—do you know the people—what the homeowner's names were?

A. No, I don't.

Q. When—how long were you speaking with them for?

A. Maybe a minute or two, two minutes.

Q. And after speaking with them what did you do?

A. I came back over to [Romero-Diaz] and I told them I just spoke with the homeowners who called the crash in. I said now is the time to be honest with me.

Q. And when you approached [Romero-Diaz], is Trooper Schatzmann still there?

A. Yes, I believe he was standing in close proximity. Yes.

Q. And is that the front of the patrol car?

A. Like I said, I believe it was right in the front.

Q. And how did [Romero-Diaz] respond?

A.    He put his head down and said yes, I was driving.

N.T. at 53-55.  Trooper Schatzmann testified that he and Romero-Diaz stood at the front of the patrol vehicle for a "[f]ew minutes." *Id.* at 33.  He asked Romero-Diaz some questions but his response was "very minimal" and "[h]e was kind of bobbing his head." *Id.* at 33-34.  Once Trooper Hope joined them and Romero-Diaz admitted that he had been driving, Trooper Schatzmann administered the HGN test, which Romero-Diaz failed, and placed him under arrest for DUI. *Id.* at 34, 36.

Considering the totality of the circumstances, the Troopers' basis for detaining Romero-Diaz prior to issuing *Miranda* warnings was to investigate the accident.  The Troopers' inquiries took place in public view at the scene of the accident.

Although the Troopers restrained Romero-Diaz only for the duration of the drive to the scene, and immediately removed him from their vehicle and removed his handcuffs, they both stood with him at the front of the police vehicle.  They did not threaten or draw their weapons, or otherwise engage in a show of force.  However, Trooper Hope explicitly stated to Romero-Diaz, "[N]ow is the time to be honest with me."  N.T. at 54.  The Troopers never indicated to Romero-Diaz that he was free to leave, and his passenger remained handcuffed in the backseat of the police vehicle while they questioned Romero-Diaz.

Under these circumstances, we conclude that Trooper Hope's statement was "reasonably likely to elicit an incriminating response from the

suspect" and that Romero-Diaz's detention was sufficiently coercive at this point to constitute the functional equivalent of arrest. *Williams*, 941 A.2d at 33. Thus, he was in custody for purposes of *Miranda* when he admitted he was the driver of the vehicle. For failure to administer *Miranda* warnings in a custodial setting before eliciting Romero-Diaz's confession, it must be suppressed. *Thompson*, 93 A.3d at 484.

"Because a confession is the most damning of all evidence, we cannot say that we are convinced beyond a reasonable doubt that the error did not affect the judgment." *Commonwealth v. Bullard*, 350 A.2d 797, 801 (Pa. 1976). Accordingly, we must vacate the judgment of sentence and remand for additional proceedings consistent with this memorandum.

Judgment of sentence vacated. Order denying Romero-Diaz's motion to suppress his confession reversed. Case remanded for additional proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/20/2014</u>