J-S22005-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EZEQUIEL B. ALMODOVAR | : | |
| | : | |
| Appellant | : | No. 1034 MDA 2024 |

Appeal from the Judgment of Sentence Entered November 8, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0004583-2020

BEFORE:   LAZARUS, P.J., BOWES, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.:          **FILED: OCTOBER 17, 2025**

Ezequiel B. Almodovar appeals from the judgment of sentence, entered in the Court of Common Pleas of Lancaster County, following his conviction for, among other crimes, two counts of first-degree murder.[1]  We affirm.

Around 6:45 a.m. on July 28, 2022, a citizen on a morning bike ride called 911 after seeing a smoldering pickup truck about 100 yards off the roadway.  Officers responded and discovered two badly burned bodies, one of which was still on fire.  They learned that the vehicle was registered to Eugenio Morales-Torres, and an autopsy confirmed that the bodies were of Morales-Torres and Jonathan Rivera.  A forensic pathologist determined that "Morales-Torres had four gunshot wounds:  one to the left of his chest and three to his

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502(a).

backside. One bullet entered the top back of his head, one struck his lung, and one struck his liver." Trial Court Opinion, 10/30/24, at 6. Rivera likewise died of multiple gunshot wounds, with one bullet striking his posterior and continuing to the femur. He "also sustained a gunshot to his head which traveled from the left side to the right side." *Id.* at 7.

Investigators quickly connected Morales-Torres' vehicle to Almodovar. Shortly before midnight on July 27, 2022, Rivera's girlfriend had called 911 to request a welfare check, stating that Rivera had gone to Almodovar's home. Rivera's girlfriend reported that she and a friend drove by Almodovar's house and saw a truck in the driveway, as well as Almodovar with bloodstains on his shirt. Further investigation and search warrants yielded additional evidence linking Almodovar to the killings.

Almodovar testified and admitted that he shot and killed both men, placed Rivera's gun and the corpses in Morales-Torres' vehicle, then hid and burned the truck. At trial, Almodovar argued self-defense, explaining that he and Rivera met in prison and upon their release decided to sell cocaine together. Almodovar kept approximately $20,000.00 in cash buried on his property and testified that Rivera and Morales-Torres came to rob him. The trial court's opinion aptly summarizes Almodovar's testimony:

> According to [Almodovar], []Rivera called [Almodovar] asking where he was, and [Almodovar] told him he wasn't around. [Almodovar] believed []Rivera was calling for drugs. He guessed that approximately 30 minutes after they spoke, an unfamiliar black truck reversed into his driveway and stopped approximately 6 feet away from his garage door. [Almodovar] claims []Rivera got out of the truck with a beer in his hand and began to approach

- 2 -

[Almodovar]. He stated that he "noticed something bulging out of [his] waistband." [Almodovar] claimed, "it was like a magazine on the bottom, the butt end of that gun, like what created the shirt to poke out a little more[.]" Next, [Almodovar] claimed []Morales-Torres got out of the truck, and he was also holding a beer can. [Almodovar] claimed he began to feel uneasy, so he "darted through the man door."

When he got inside, [Almodovar] claims he tried to grab the latch when the door was "pushed in or kicked in." [Almodovar] states that []Rivera said "come out or we're coming in[,]" and he was "at gunpoint." He claimed []Rivera asked him "where's it at?" And [Almodovar] informed him that there was "a little over 20 grand" buried. At that moment, [] Rivera watched as a silver car drove by, and "the minute he took his eyes off [him] ... [Almodovar] took advantage of it." He jumped on []Morales-Torres and grabbed the gun he was holding, and the gun went off "a couple times." He claims []Rivera "went down or got hit or ducked or [he doesn't] know what happened or how it happened." [Almodovar] said []Morales-Torres was on his left side when he thrust forward and twisted, and []Morales-Torres was on one knee when "he got hit[,]" and landed on [Almodovar].

*Id.* at 8-9 (citations to transcript omitted).

Almodovar then explained that he called his cousin, James Diggs, who told him that no one would believe he shot the men in self-defense. The two then cleaned up the scene and loaded the bodies into the truck. According to Almodovar, Diggs drove the truck while he followed in a separate vehicle. Diggs then signaled for Almodovar to wait and drove the truck off the road. Shortly thereafter, Diggs entered Almodovar's vehicle with a gas can, and Almodovar saw flames.[2]

---

[2] Diggs was later killed while committing a robbery. **See** N.T. Jury Trial Vol. V, 6/12/23, at 1100.

The jury rejected Almodovar's self-defense claim and convicted him of all counts. Both Almodovar and the trial court have complied with Pa.R.A.P. 1925 and Almodovar raises four issues for our review.

I. Whether the evidence was insufficient to prove []Almodovar guilty beyond a reasonable doubt of first-degree murder where the Commonwealth failed to establish beyond a reasonable doubt the specific intent to kill with malice.

II. Whether the trial court abused its discretion in rejecting Almodovar's argument that the weight of the evidence was against his conviction for first-degree murder where Almodovar gave compelling testimony in support of his self-defense claim.

III. Whether the trial court committed reversible error for failing to instruct the jury on the castle doctrine justification defense.

IV. Whether the [t]rial court erred in denying Almodovar's [m]otion for [d]ismissal under Pa.R.Crim.P. 600[,] which violated his 6th Amendment speedy trial rights under the United States Constitution and Article I, Section 9 of the Constitution of the Commonwealth of Pennsylvania.

Almodovar's Brief, at 6.

Almodovar's first issue challenges the sufficiency of the evidence supporting the charges of murder in the first degree. Our standard of review is as follows:

[W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not [re-]weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element

- 4 -

of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated[,] and all evidence actually received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

To sustain a conviction for first-degree murder, the Commonwealth must establish that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. *See* 18 Pa.C.S.A. § 2502(d); *Commonwealth v. Spotz*, 759 A.2d 1280, 1283 (Pa. 2000). Almodovar challenges the third element of subsection 2502(d)—specific intent to kill. Almodovar's Brief, at 21 ("It is undisputed that Rivera and Morales-Torres were shot and died from their injuries, and Almodovar is the person responsible for the shooting. However, the evidence presented by the Commonwealth has failed to support the necessary element of "specific intent to kill[.]"). He maintains that the evidence establishes that Morales-Torres and Rivera were the aggressors.

Once a claim of self-defense is raised the Commonwealth bears the burden of disproving the defense beyond a reasonable doubt. *Commonwealth v. Bullock*, 948 A.2d 818, 824 (Pa. Super. 2008). It meets its burden if it establishes one or more of the following: "1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused

- 5 -

had a duty to retreat and the retreat was possible with complete safety." *Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014).

Notably, Almodovar did not claim in his concise statement that the Commonwealth failed to meet its burden as to disproving self-defense, nor does he make that claim in his brief. Thus, any claim in that regard is waived. *See Commonwealth v. Tyack*, 128 A.3d 254, 260 (Pa. Super. 2015) ("As this Court has consistently held . . . the 1925(b) statement needs to specify the element or elements upon which the evidence was insufficient.").

As to the preserved aspects of his claim, *i.e.* the assertion that the evidence establishes that Morales-Torres and Rivera were the aggressors, Almodovar erroneously views the evidence in the light most favorable to himself. "When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). Viewing the evidence in the light most favorable to the Commonwealth, as we must, we find that the jury rationally concluded Almodovar's account was false. Almodovar's argument relies on the fact that his testimony was mostly unrebutted. Of course, that is largely because Almodovar covered up the crime. That this case involves a claim of self-defense does not detract from the principle that circumstantial evidence is sufficient to meet the Commonwealth's burden, *see Commonwealth v. Brockington*, 230 A.3d 1209, 1212 (Pa. Super. 2020), and Almodovar's argument fails to account for

the inferences that may be drawn from his testimony that he covered up the crime. It is well-established that efforts to conceal wrongdoing may be considered as circumstantial evidence of guilt:

> It is well settled that when a person has committed a crime, and knows that he is wanted for it, any attempt by that person to flee or conceal his whereabouts, to escape from custody or resist arrest, to conceal or destroy evidence, to give false statements or testimony, to intimidate or attempt to influence witnesses, or to otherwise engage in conduct designed to avoid apprehension or prosecution for such crime may be admissible as evidence of consciousness of guilt, and may, along with other evidence in the case, form a basis from which guilt may be inferred.

*Commonwealth v. Pestinikas*, 617 A.2d 1339, 1347–48 (Pa. Super. 1992).

Our Supreme Court's decision in *Commonwealth v. Dollman*, 541 A.2d 319, 322 (Pa. 1988), illustrates the point. There, in June of 1980, a child found a skull near the Dollman's home, but no identification could be made. Four years later, police received information that the remains may have belonged to Kathleen Dollman's husband. Dollman was arrested and confessed to killing her husband in December of 1979 and testified that the victim was a serial batterer who, on the night of his murder, had gone on a drunken rampage that caused Dollman to fear for her life. She shot and killed him, then buried his body underneath the basement and concocted a story that he had moved. Later, Dollman began dating another man, Joseph Orlando, and with his help exhumed the body and burned the remains.[3]

_____

[3] Dollman's son, concerned that the bullet was in the skull, had previously cut off the skull and "plann[ed] to keep the head, because he found it 'fascinating.'
*(Footnote Continued Next Page)*

- 7 -

The jury convicted Dollman of voluntary manslaughter. This Court ordered a new trial on the basis that the evidence of what Dollman and Orlando did to the body years after the killing was highly inflammatory and of little probative value and thus inadmissible. Our Supreme Court reversed.

> Although Dollman admitted to having killed her husband, the pivotal issue at trial was her state of mind at the time of the killing. The prosecution attempted to prove that Dollman was guilty of murder of the first degree, while the defense sought to establish that the killing was a justifiable homicide committed in self-defense. For this reason, evidence of Dollman's disposal of the body supplied important proof relative to whether she acted with malice. **Human experience teaches that persons who commit justifiable homicides, without malice, do not ordinarily feel compelled to destroy the victim's body**. Rather, it is those who harbor a guilty conscience, believing their acts not to have been justified, who are most likely to conceal evidence of their deeds. Further, it is important to note that the baneful manner in which Dollman disposed of her husband's body could very reasonably have been taken by the jury as evidencing Dollman's attitude towards her husband during his lifetime, inferring a hatred that strongly supported the prosecution's contention that the killing was committed with malice.

*Id.* at 322 (emphasis added).

Thus, even setting aside the implausibility of Almodovar's testimony of how the shootings unfolded, we conclude that his post-shooting actions are more than sufficient circumstantial evidence establishing that the victims were not the aggressors. Indeed, his concealment and destruction made it impossible to test, for example, the firearm destroyed in the fire. Moreover,

---

In June of 1980, however, Beauchamp's dog overturned the plastic bucket and carried away the head, eventually leaving it outdoors near the Dollman residence." *Dollman*, 541 A.2d at 321.

the pathologist could not fully test the bodies for evidence like gunshot residue or conduct a complete autopsy. **See, e.g.**, N.T. Jury Trial Vol. V, 6/12/23, at 1021 ("[The skulls] are all burned up. And in terms of this issue, I would not be able to tell you if it's contact or close-range gunshot wounds."). Accordingly, the circumstantial evidence readily supports the jury's finding that Almodovar specifically intended to kill both men.

Almodovar's second issue pertains to the weight of the evidence supporting the verdict. Our standard of review is well-settled.

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

**Commonwealth v Hunzer**, 868 A.2d 498, 506–507 (Pa. Super. 2005).

Unlike the first argument, Almodovar's argument for this issue directly challenges the Commonwealth's burden to disprove self-defense. He argues that "[t]he weight of the evidence was against the notion that the Commonwealth disproved that Almodovar acted in self-defense." Almodovar's Brief, at 24. He submits that the Commonwealth failed to show "that Almodovar provoked Rivera and Morales-Torres. Similarly, there was no

- 9 -

direct evidence that Almodovar did not reasonably believe he was in danger of death or serious bodily injury and needed to use deadly force." *Id.* at 26.[4]

This argument simply repackages his sufficiency claim. Whether the Commonwealth "disproved that Almodovar acted in self-defense" is a sufficiency concept as it asserts that the Commonwealth failed to meet its burden of proof relative to the self-defense claim. However, "[a] motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). By failing to develop a proper weight argument he has waived the claim. *See Commonwealth v. Sexton*, 222 A.3d 405, 416 (Pa. Super. 2019) (weight claim waived where the appellant "conflate[d] weight and sufficiency claims and has essentially failed to develop a challenge to the weight of the evidence").

Alternatively, we would find no abuse of discretion in the trial court's rejection of Almodovar's weight claim. In *Commonwealth v. Houser*, 18 A.3d 1128 (Pa. 2011), our Supreme Court rejected Houser's weight-of-the-evidence claim in a self-defense case for the following reasons:

> It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this

---

[4] As discussed in the next issue, Almodovar argues that he had no duty to retreat and thus does not address that component of self-defense.

- 10 -

standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

By virtue of the verdict, it is clear the jury did not find [Houser]'s self-serving self-defense testimony credible. It is also clear, in light of the extensive testimony and ballistics evidence offered by the Commonwealth, that the jury's verdict does not shock one's sense of justice.

*Id.* at 1135–36 (quotation marks and citation omitted).

Similarly, the jury did not accept Almodovar's version of events. As we have discussed, the circumstantial evidence readily establishes Almodovar's guilt. The trial court did not abuse its discretion in deciding the jury's verdict did not shock its conscience.

Almodovar's third claim challenges the trial court's failure to instruct the jury on the "castle doctrine." The General Assembly permits the use of deadly force under the rubric of justification. The general rule is that the "use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). The statute restricts the use of deadly force, as, among other requirements, the actor must retreat if possible. *Id.* § 505(b)(2)(ii). An exception to this duty is the castle doctrine, which is "often described as being of ancient origins" and reflects "the belief that a person's home is his castle and that one should not be required to retreat from his sanctum." *Commonwealth v. Childs*, 142 A.3d 823, 828 (Pa. 2016). The General Assembly has codified this principle as follows:

- 11 -

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping[,] or sexual intercourse compelled by force or threat; nor is it justifiable if:

. . . .

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, **except the actor is not obliged to retreat from his dwelling** or place of work, **unless he was the initial aggressor** or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S.A. § 505(b)(2)(ii) (emphases added). The term "dwelling" is defined as "[a]ny building or structure, including any attached porch, deck[,] or patio, though movable or temporary, or a portion thereof, which is for the time being the home or place of lodging of the actor." *Id.* § 501.

Almodovar requested that the trial court instruct the jury that he had no duty to retreat since he was in his dwelling. The trial court declined, agreeing with the Commonwealth that the deadly encounter took place in the driveway. *See Commonwealth v. Marcocelli*, 413 A.2d 732, 734 (Pa. Super. 1979) ("The front lawn or yard area surrounding the building or structure is not included in the definition of 'dwelling'").

Almodovar argues that the trial court failed to appreciate the significance of his testimony that he initially tried to flee into his house, followed by Rivera kicking the door and forcing Almodovar back outside. We agree with the Commonwealth that we may not address the merits of his argument as Almodovar failed to preserve his claim. He requested the castle doctrine language in the conference immediately preceding the jury receiving

its instructions. However, he failed to object after the trial court completed the charge. That failure is fatal. **See Commonwealth v. Moury**, 992 A.2d 162, 178 (Pa. Super. 2010) ("Generally, a defendant waives subsequent challenges to the propriety of the jury charge on appeal if he responds in the negative when the court asks whether additions or corrections to a jury charge are necessary.") (citations omitted). The trial court asked the attorneys to approach before sending the jury to deliberate, and asked "Anything further?" N.T. Jury Trial Vol. VI, 6/13/23 at 1309. Almodovar replied, "Nothing." This waived his claim. **See Moury**; Pa.R.Crim.P. 647(c) ("stating that "[n]o portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate").

Finally, Almodovar argues that trial court erred in denying his Rule 600 motion, violating his 6th Amendment speedy trial rights under the United States Constitution and Article I, Section 9 of the Constitution of the Commonwealth of Pennsylvania.[5] He claims that the Commonwealth's failure to exercise due diligence caused a violation of his right to a speedy trial.

_____

[5] Almodovar does not develop any argument that his Sixth Amendment right to a speedy trial was violated. "While both Rule 600 and the Sixth Amendment address the right to a speedy trial, they provide separate grounds for asserting a claim of undue delay[.]" **Commonwealth v. Speed**, 323 A.3d 850, 853 n.4 (Pa. Super. 2024). Almodovar exclusively relies on Rule 600 precedents and thus we do not address his constitutional claim. Additionally, "Article I, Section 9 of the Pennsylvania Constitution protects a criminal defendant's right to a speedy trial co-extensively with the Sixth Amendment to the United States Constitution." **Commonwealth v. DeBlase**, 665 A.2d 427, 432 n.2 (Pa. 1995)

Rule 600 requires the Commonwealth to bring the defendant to trial within 365 days of the date it filed the written complaint. *See* Pa.R.Crim.P. 600(A)(2)(a). Periods of delay attributable to the court, the defense, or other circumstances despite the Commonwealth's exercise of due diligence, is excluded from the 365-day calculation. *Id.* at 600(C)(1)-(2). "We generally review Rule 600 decisions for an abuse of discretion, but our review is plenary where 'the dispositive question implicates legal issues[.]'" *Commonwealth v. Lear*, 325 A.3d 552, 557 (Pa. 2024) (quoting *Commonwealth v. Harth*, 252 A.3d 600, 614 n.13 (Pa. 2021)). Here, we conclude that the dispute involves a pure question of law, which we review *de novo*. *Id.*

Presently, the Commonwealth filed charges on July 29, 2020, and trial commenced 1,042 days later, on June 5, 2023. We begin our analysis with the trial court's conclusion that, due to the COVID-19 pandemic and accompanying courtroom closures, the 356-day period must be measured from June 30, 2021, when the local judicial emergency order regarding the pandemic expired. Trial Court Opinion, 10/30/24, at 23-24 ("Due to the COVID-19 pandemic, the undersigned judge, as the President Judge, issued administrative orders suspending the application of Rule 600 . . . . As such . . . the adjusted run date became July 1, 2021."). The trial court then noted that trial began 705 days after July 1, 2021, examined the relevant delays, and concluded that "the Commonwealth is responsible for delaying the commencement of [Almodovar]'s trial [by] 214 days." *Id.* at 25.

We agree with the court's ruling that the effective mechanical date was July 1, 2021. We recently summarized the applicable law regarding periods of "judicial delay" and when the Commonwealth must first establish its due diligence:

> Where delay occurs because of a single judge's scheduling conflicts, the Commonwealth must demonstrate "that it complied with the due diligence requirements of Rule 600 at all relevant periods throughout the life of the case." *Commonwealth v. Harth*, [] 252 A.3d 600, 603 ([Pa.] 2021). However, where the cause of the delay is attributable to matters outside the Commonwealth's control, such as court closures during a pandemic as well as other "medical-, weather-, and security-related emergencies," *Lear* provides that these delays constitute "other periods of delay" for which the Commonwealth does not need to prove due diligence. *Lear*, 325 A.3d at 563 n.9. The *Lear* Court found delays attributable to the pandemic to be excludable time because **"[n]o amount of due diligence on the part of the Commonwealth could have possibly hastened [the defendant]'s trial date." *Id.*** (emphasis added).

*Commonwealth v. Brandt*, 337 A.3d 973, 980 (Pa. Super. 2025). Therefore, whether the Commonwealth was duly diligent during the judicial emergency is irrelevant, and the Commonwealth had one year from July 1, 2021, to try the case.

Almodovar does not develop a responsive argument to starting the clock on July 1, 2021. Instead, he simply points out that "Almodovar's preliminary hearing took place on October 16, 2020, at the Lancaster County Courthouse. Moreover, pursuant to an administrative order dated February 21, 2021, criminal trials could be scheduled at the discretion of each presiding Judge beginning March 1, 2021, and homicide trials did occur." Almodovar's Brief,

at 35. The fact that non-trial proceedings took place prior to his trial is not dispositive. Furthermore, it is not clear whether the homicide trials referenced by Almodovar were jury or non-jury. Relatedly, there are no record facts to ascertain, for example, whether those other cases had their own Rule 600 issues that warranted trying them before Almodovar's trial. Due to the failure to develop an argument, we agree with the trial court that the Commonwealth effective mechanical run date was July 1, 2021.

Next, we find that the trial court erred as a matter of law in determining whether the Commonwealth complied with its Rule 600 obligations by reference to the ultimate trial date. Almodovar filed his motion to dismiss on March 21, 2022, and a supplemental motion on May 31, 2022. As we have already concluded that the Rule 600 clock started on July 1, 2021, Rule 600 had not been violated as of the time he filed his motion to dismiss.

Notwithstanding, both the parties and the trial court reference matters occurring *after* the motions were filed and *after* the trial court denied Almodovar's motion. We conclude that the only issues before this Court pertain to the allegations made within the Rule 600 motion to dismiss. "To obtain relief, a defendant must have a valid Rule 600 claim **at the time he files his motion to dismiss** the charges." ***Commonwealth v. Hyland***, 875 A.2d 1175, 1189 (Pa. Super. 2005) (emphasis added). Almodovar's argument suggests that the trial court, on the morning of trial, could have *sua sponte* dismissed the case for a Rule 600 violation based on an independent determination that the Commonwealth violated Rule 600 based on assertions

not raised by Almodovar. That cannot be the case. The only issues preserved were those raised within the motion to dismiss and addressed by the trial court. In effect, Almodovar preserved only a *Lear* claim had the Supreme Court ruled as Justices Donohue and Wecht urged. ***See Lear***, ***supra*** at 564 ("With regard to due diligence, a prosecutor gets no time-outs. A prosecutor must act with due diligence 'throughout the life of a case.' That was the law of Pennsylvania, until now.") (Wecht, J., dissenting).[6] If Almodovar wished to argue that any other periods of time after the ruling also factored into a Rule 600 analysis, he was required to renew his motion to dismiss. Because the *Lear* Court vindicated the trial court's ruling, the trial court did not err in denying the motion to dismiss.

_____

[6] The Commonwealth argues in its brief that it did exercise due diligence throughout the life of this case, and suggests that Almodovar implicitly consented to delaying trial by, for example, submitting letters in connection with a request to take the death penalty off the table. Almodovar argued that he has no burden to request a trial date and the Commonwealth was still required to list the case. For the reasons discussed, we need not discuss due diligence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/17/2025